UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,          )
                                   )
v.                                 )          No. 3:07-CR-147
                                   )          (Phillips / Shirley)
REGINALD LAMAR SEIGLE,             )
                                   )
                Defendant.          )

## <u>REPORT AND RECOMMENDATION</u>

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. On February 12, 2008, this matter came before the Court for an evidentiary

hearing on the defendant's Motion to Suppress Evidence [Doc. 13]. Defendant Reginald Seigle was

present with his counsel, Stephen Burroughs. The government was represented by Assistant United

States Attorney Cynthia Davidson. The Court received the testimony of two witnesses, two exhibits

and heard argument of counsel on the merits of the motion. At the conclusion of the hearing, the

Court granted leave for the parties to review the record and file post-hearing briefs. Mr. Seigle filed

his Post-Hearing Memorandum in Support of Motion to Suppress Evidence [Doc. 20] on February

19, 2008; the United States submitted its Post Hearing Response to Defendant's Motion to Suppress

Evidence [Doc. 22] on February 20, 2008. The Court took this matter under advisement on February

21, 2008. After a careful review of the record of the hearing, the initial filings on this issue, the post

hearing briefs and consideration of authority, this Court finds the search of Mr. Seigle's home was

not unreasonable and recommends the motion be denied.

**A. FACTS**

The facts before the Court are largely undisputed. The indictment charges Mr. Seigle with a single count of felon in possession of a Colt AR-15 rifle from October 24, 2007, to November 7, 2007. This firearm was found in the attic of Seigle's home during a search by law enforcement officer which included state probation officers. The Court received the testimony of Erin Monroe, a State of Tennessee enhanced probation officer; Jeremy Maupin, an investigator with the Knoxville Police Department; Bethel Poston, and agent with the Drug Enforcement Administration; Joseph Kszos, a State of Tennessee parole officer; and Reginald Seigle, the defendant.

<u>1. Erin Monroe</u>

*a) direct examination*

Erin Monroe testified that she has worked an a supervision officer with the enhanced probation office for the past four years. At the time of these events, Monroe was supervising Seigle. By way of background, Monroe testified that on December 6, 2005, Seigle was convicted of two felony offenses in the Knox County Criminal Court and sentenced to a six-year term of probation. There were various gradations of state probation, but Seigle was assigned to ordinary probation at first. On December 14, 2005, Seigle signed a "standard probation order" setting forth the rules and conditions of probation, Exhibit 1.

Monroe testified that in June 2007, the judge who sentenced Seigle found him to be in violation of the terms and conditions of his probation. Specifically, Seigle was not employed, had not paid his supervision fees, had not paid his court costs, was not current on his child support and had tested positive for drug use. Seigle was arrested and held in jail pending further hearing on these violations.

During the time he was waiting in jail, on June 15, 2007, Seigle was interviewed by Lisa Mooneyham, an officer from the enhanced probation department. Monroe testified that enhanced probation is a higher grade of supervision and has added conditions, such as: a 6:00 p.m. curfew; prohibition of any alcohol possession or use; weekly reporting; "more contact with law enforcement"; and "more contact with the probation officer." Monroe testified that any defendant must be interviewed by the enhanced probation office in order to be recommended for the program. Enhance probation then prepares a report for the judge indicating whether it would be appropriate to offer enhanced probation to the candidate as an alternative to serving the original prison sentence. Seigle was recommended for enhanced probation in a written report submitted by Ms Mooneyham, Exhibit 2. On July 10, 2007, Seigle was assigned to Monroe's caseload for supervision. Monroe testified that Seigle was placed on enhanced probation because he had violated his original probation, due to his not working, not paying his bills, and engaging in drug use.

Monroe testified that on July 2, 2008, Seigle was advised of "each individual rule of regular probation," and all of the extra rules for enhanced probation, the related fees for this supervision, and was offered the opportunity to ask any questions. Monroe testified that some of the terms of enhanced probation are the same as regular probation, one of these being paragraph seven.

The identical paragraph seven of the probation and enhanced probation rules reads:

> I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by and Probation/Parole officer or law enforcement officer, at any time.

> Exhibit 1; Exhibit 3.

Monroe further testified that she personally explained the paragraph seven rule to Seigle during their initial meeting. Monroe said that "we have been searching more and more" because

3

their office now has more probation officers to accomplish this than were available in the past. Because searches are increasingly likely in her supervision, Monroe testified that she makes an effort to be certain probationers are aware of the rule.

Monroe testified that she made the decision to search Mr. Seigle's residence based upon two developments. First, there was reported to be an increased volume of "human traffic" in and out of Seigle's apartment. Second, the week prior Seigle had reported (as required) a contact with law enforcement. Monroe testified that police were asked to accompany her to search "for safety reasons" and so that the officers can take possession of any evidence that may turn up during the search. Parole officer Kszos, KPD Investigator Maupin and DEA Agent Poston accompanied her to the search.

Monroe testified that she and Mr. Kszos first went to Seigle's apartment alone, during the daytime. They knocked at the door, but received no answer. Seigle was working a job in the evenings, so they expected him to be at home during the day. Seigle eventually awoke and opened the door to Monroe and Kszos. Monroe testified that when he opened the door, she told Seigle "we were there for a search of his premises." Monroe testified that while Seigle was sleepy, he indicated by his response that he was "okay" with the proposed search. Monroe recalled that he did not "tell us to leave, or not to search."

Monroe said a rifle was found in Seigle's attic and there was alcohol found in the kitchen. Monroe added that the only problem she had identified with Seigle before the search was the fact that he worked nights and that Seigle reported to enhanced probation without problems.

*b) cross examination*

On cross examination, Monroe testified that she had been to Seigle's home on prior occasions to do a "home check." The purpose of the home check is to confirm the probationer still lives at the location. During a home check, Monroe did not go inside the apartment and police officers did not accompany her. Monroe testified that enhanced probation officers search when they have suspicions there may be a problem and also randomly.

Monroe testified further to the two factors that prompted her decision to search Seigle's apartment. As to the contact with law enforcement, Monroe understood that Seigle was questioned by police at his brother's house after authorities arrived and asked for identification, which he presented. The officers later reported this contact to Monroe, but Seigle's version of the contact differed from that report. Monroe recalled she had also been informed that Seigle had tried to leave the house when he was made aware the police wanted to talk to him. As to the other factor, Monroe testified that she had been told there was "human traffic of a great deal" in and out of Seigle's apartment. She explained that this phrase meant that there were more people coming and going than from an average house. Kszos had told her the people observed in and out were drug users and drug dealers and "that type of people." These reports of human traffic did not specify a number of persons or a time of day. Monroe testified that Seigle lived in a "connected townhome" building and that the information she received was that these persons were coming and going from various townhomes.

When asked why she did not take along regular uniformed officers for the search, as opposed to a DEA agent and a KPD drug investigator, Monroe was not certain. She testified that she was originally contacted by Kszos about searching. Monroe testified that she did not speak with either

of these two officers but, rather they had contacted Kszos first. Monroe added that the two officers were "more familiar with the house." Kszos had specifically wanted these two police to go with them on the search. Attorney Burroughs asked the reason she and Kszos went inside the house first, before the officers even arrived, if safety was a reason for asking the officers to accompany the probation officers. Monroe testified that all four set out for the search together, but that she went into the house first, then opened the other door for Kszos, who came in second. The officers arrived thereafter. Monroe said that if a probationer sees a police officer at the door, they are less likely to answer than if only a probation officer is present, so the practice of her department is to approach the door first.

Monroe confirmed that at the time of this search Seigle was working, reporting as required and otherwise in compliance with the conditions of enhanced probation. Seigle had met with Monroe the day before at her office. Seigle was "a little bit behind in his fees," but had provided only negative drug screens during his time on enhanced probation, from July through November 2007.

Attorney Burroughs asked Monroe whether on November 6, 2007, she had any reason to suspect Seigle was involved in criminal activity. Monroe testified that she did not, "not more than anybody else." Monroe stated that she did not take any action to verify the report of "human traffic" at the residence. She testified that the enhanced probation officers rely on a variety of information sources with regard to the activities of those under supervision, but that these sources range in reliability.

Monroe testified that she and Kszos went to Seigle's front door first. She described that Seigle did not "fight the search." Seigle was sleepy and was in his underwear when he answered

the door.  Seigle asked if he could go upstairs to put clothes on because he was "basically naked." Monroe told him that he would have to wait.  When Kszos came inside, Seigle "somehow got his clothes on," but Monroe could not recall how this came about.    Monroe later went upstairs to retrieve cigarettes for Seigle, who was directed to sit on the couch.  Monroe could not remember whether or not Seigle might have asked the probation officers for an ashtray.

Monroe testified that next Poston and Maupin came inside the apartment.  Kszos had called them after Seigle answered the door.  Seigle, at one point, attempted to get up from his seat on the couch, but was told to sit back down.  Kszos was at the doorway watching Seigle during the search.

Monroe testified that she did not hear anyone else ask Seigle for permission to search the apartment.  Monroe testified that she just informed him they were going to do the search and Seigle made no dispute with the search.  After they initially entered the residence, Monroe and Kszos told Seigle they were waiting for the police to arrive and Seigle didn't protest.

*c) redirect examination*

On further examination by the government, Monroe described Seigle as "compliant" and acquiesced in what she and the others were doing.

## 2.  Jeremy Maupin

*a) direct examination*

The next witness called by the government was Jeremy Maupin, a narcotics investigator at KPD, where he has been an officer for the past seven years.  Maupin testified that he first heard of Reginald Seigle in a debriefing of arrestee Bobby McClure.  McClure told Maupin that Seigle, who lives two doors down from him, was McClure's supply of cocaine.  Maupin testified that later, when McClure was charged with violating the terms of his pretrial release and agents went to arrest him,

"two men ran out," and that one was Seigle.  When asked about the term, "human traffic," Maupin testified that he would use this to describe when people come and go frequently, staying only short periods of time.  After McClure's arrest on pretrial release, Agent Poston notified Kszos at the parole office, according to Maupin, who then "asked if we would like to go out and search and we said we'd help."  Maupin testified the probation officer set up the date and time for the search and that they, "gave us the green light."

At the apartment at the beginning of the search, Maupin had an exchange with Seigle. Maupin testified that he asked, "is there anything in the house we should know about?"  Maupin said that it is his practice to ask a subject this question before initiating a search.  Maupin testified that Seigle responded, "no, go ahead and search."  Maupin said that once the search was underway, he noticed a ceiling panel that appeared to open into the attic.  He thought this was suspicious because the panel had no dust on it, and no spider webs on it.  Inside this panel, the firearm was discovered.

*b) cross examination*

On cross-examination, Maupin testified that he was involved in the initial arrest of McClure on drug charges some months before the events in question, whether it could be described as "several" or "four to five" he was not certain.  McClure told police during debriefings that he had two sources of cocaine.  The officers pursued the other supplier and continued investigation of other drug activity, but did not pursue the information about Seigle.  Later, after hearing that McClure had returned to selling cocaine while on pretrial release, the officers (including Maupin) conducted surveillance of McClure's apartment.  Maupin testified that they "saw heavy traffic all day long" between McClure's apartment and Seigle's apartment at the same location.

When asked who it was they observed going back and forth between the apartments, Maupin said it was McClure, a man named Bubba whose last name is unknown, and another unidentified man. Bubba was McClure's roommate. Maupin testified that he was aware that McClure and Seigle are cousins. In addition to these people, maupin saw other people pulling up in cars at McClure's house and at Seigle's house for short periods of time. The officers made no recording or photographs of this "human traffic." Maupin testified that the officers did not see Seigle doing anything illegal during the surveillance.

Maupin was asked who it was that initially called Kszos. Maupin testified that he and Poston discussed it, then poston made the call to Kszos. Maupin said the officers called to give their information to Kszos, not to ask for permission to search Seigle's house and maintained that the search was Kszos' idea.

Maupin agreed that the officers did not have any information that would have justified seeking a search warrant at that time. The probation officers let the police into Seigle's house at the time of the search, after Kszos called Maupin and said it was okay to come to the apartment because the supervision officers were inside. Maupin stated that he never asked, "Mr. Seigle, may I search your residence," and never presented Seigle with a consent to search form. Maupin testified that he asked Seigle to tell him where anything illegal might be before they started the search, stating that this is his practice. Maupin testified that Seigle told him there was not anything illegal and to "go ahead and search." When Maupin arrived at the residence, Seigle was in the living room, but Maupin could not recall whether he was on the couch. Maupin also saw some white residue in a cooking pot on the stove, which field tested negative for cocaine. Maupin did not remember when

McClure was initially arrested, but testified that McClure's arrest for violation of his pretrial release was "just before" the search of Seigle's home.

### 3. Bethel Poston

*a) direct examination*

The next government witness, Bethel Poston, testified that he has worked with the Drug Enforcement Administration for the past three years in narcotics investigations. Poston testified that he first saw Seigle as he and other officers were conducting surveillance on McClure's residence nearby. Poston knew that Seigle was present when McClure was arrested for violation of the terms of his pretrial release. Poston said that Seigle "tried to leave out the back door" at the arrest. Police stopped Seigle and asked for his identification, which he produced. Later, the officers followed up on Seigle's identification and learned that he was on probation.

Poston testified that McClure and Seigle lived very close to one another, they shared a common front approach area; Seigle lived in apartment B and McClure lived in apartment D, across from one another. Poston testified that during the surveillance police saw "carloads of people pull up," then one person from the car go inside for a short period of time. This high volume of traffic was going on in the middle of the day. Poston said that based on these observations, it was apparent that drug activity was going on.

After learning Seigle was on probation, Poston contacted Kszos. Kszos informed Poston that consent to warrantless searches was a condition of Seigle's enhanced probation, although Poston had only called to report what Seigle was up to. Poston testified, "I told him I was interested in helping with the search and being there." Poston described that the idea to search was "more of my

suggestion," but that was after Kszos relayed the probation condition. Poston testified that he originally had just called to tell him about the contact with a probationer under these circumstances. Poston testified that when he and Maupin arrived at the apartment, the probation officers told the police that Seigle was "okay with the search."

*b) cross examination*

Poston further described the surveillance on cross-examination. He testified that the officers watched the apartments on October 29 and 31, 2007. He recalled that most of the people observed were coming and going from McClure's apartment. Poston testified that these people in no way appeared to be apartment residents and the cars bore license tags from other counties such as, Grainger and Morgan. Poston testified they saw about a dozen cars "in a couple hours' time" during a weekday come and go under the conditions described. Then, "every 20 to 30 minutes or so" someone would walk from one apartment to the other apartment. Poston testified that it appeared to him that "they were replenishing a drug stash" for drug sales and that, in his professional opinion, the observations were evidence of drug activity.

Poston said that he never saw Seigle commit any illegal activity and that he probably did not have enough facts to support a search warrant for Seigle's house. Poston said that he had received information that when McClure was arrested with 4 ounces of crack cocaine he was driving a car registered to Seigle. Poston testified that McClure had indicated Seigle was a cocaine source during a debriefing months earlier. Although this was significant information, the police did not pursue the lead. Poston said authorities did not realize Seigle lived in such close proximity to McClure until the later surveillance. Poston testified that they did not take photographs of the human traffic

observed nor make a videotape of it. They also did not conduct any traffic stops on the cars coming and going.

At the time of the search, Poston entered Seigle's apartment through the front door. Seigle was seated on a couch. Poston did not ask Seigle to sign a consent to search form, nor ask his permission to search. Poston did not hear anyone else ask Seigle for permission to search, although he did see Kszos talking to the defendant. Poston testified that while Seigle, Kszos, Monroe, Maupin and he were in the living room, one of the probation officers told Seigle, "we're going to take a look around, you don't mind do you?" Seigle responded, "No, go ahead." Seigle stayed in the general are of the couch during the search, standing and sitting.

Poston testified that when he saw Seigle on October 29 and 31, 2007, it was in the mid-afternoon. Poston said that he was unaware Seigle was working two jobs. Poston testified he was "fairly sure" it was Seigle he observed at those times. Poston also testified that while McClure was cooperating with authorities at the time of his debrief, he seemed reluctant to get a family member in trouble. It was apparent to the officers present that McClure would not be willing to do a "controlled buy" from a family member.

4. Joseph Kszos

*a) direct examination*

Joseph Kszos testified next for the government. Kszos stated that he has been a parole officer with the State of Tennessee for the past 20 years. Kszos confirmed that the parole office is different than the probation office. Kszos was not the supervising officer for Seigle, but did receive the call from law enforcement about him because Kszos is known to many police officers and maintains close contact during his duties as a parole officer. Kszos testified that Poston called him

to confirm whether seigle was on probation. Kszos "looked him up" and saw that he was. Kszos told Poston Seigle was subject to the "automatic search condition." Poston told Kszos that he had seen a large amount of drug activity going on around Seigle's house. Kszos recalled telling Poston, "if you want to search, just let us know and we'll go with you, I just want to check with his [probation officer] first." When asked whose decision it was to search Seigle's apartment, Kszos responded that it was Erin Monroe's.

On the date of the search, Kszos and Monroe met Maupin and Poston at a Weigle's convenience store near Seigle's house. Kszos testified that it was decided the probation officers should go to the door first, then call in the police officers for the actual search. Kszos testified this was because the supervision officers do not have training in searching residences. Kszos testified that he and Monroe mistakenly went to the back door of Seigle's house first, but eventually got inside. Once inside, they called Maupin and Poston. Kszos testified that Monroe told Seigle "we were there to search the residence." Kszos testified that he remained with the defendant in the livingroom, "because I am the oldest." Kszos and Seigle sat in the livingroom area and talked while the others conducted the search. Kszos testified that Seigle did not protest the search, did not ask them to leave and did not tell them they could not search.

*b) cross examination*

Kszos testified on cross-examination that when Poston first contacted him to report that he had noticed possible drug activity at the house where Seigle was living, Poston did not say exactly what he meant by this. Poston also did not explain what he had seen, nor did Kszos ask. Kszos testified that there are several apartments near the one where Seigle lived and if the activity observed by the police had taken place at the apartment across from Seigle's Kszos was not aware of this.

Kszos also testified that when Monroe stated the officers were there to search, Seigle did not make an objection. Kszos did not take any action to verify the information Poston had reported. Kszos testified that he believes Poston called him either the day before the search or possibly the same day. Kszos recalled that he told Poston, "to think about it" and let the supervising officers know if the police decided they wanted to search.

## 5. Reginald Seigle

*a) direct examination*

Following these witnesses, the government rested its proof. The defense then presented the testimony of Reginald Seigle, the defendant. After the Court admonished Seigle of his right to remain silent, Seigle stated that he had discussed the matter with his attorney and that he wished to testify. Seigle testified that he was in his home asleep on November 7, 2007, when he woke to "a loud banging" on his door. Seigle had worked the night before, getting off work about 9:00 a.m. Seigle testified that he had come home, showered and went to sleep at about 1:00 p.m.

When he was wakened, Seigle got out of his bed and went to the other bedroom to look out the window. Seigle looked down and saw Kszos at the door. Kszos told Seigle, "your PO is at the back door." Seigle testified that he went right down and opened the door to Monroe. Monroe then went to the front door and opened it for Kszos. Seigle testified that he was wearing only his boxer shorts and a t-shirt. Seigle asked if he could go upstairs and get clothed. Kszos went up with him while Seigle got some blue jeans that were in a doorway. Afterward, Seigle wanted to go back upstairs to get cigarettes, but was told to stay seated on the couch while Monroe got them for him. While smoking, Seigle attempted to get up for an ashtray, but was handed something like a can by

Kszos for his ashes. Seigle testified that no one asked his consent to search and that no one presented him with a form of any type.

*b) cross examination*

Upon cross-examination, Seigle confirmed that he was placed on probation in 2005 by Knox County Criminal Court Judge Leibowitz and that he understood this sentence was in lieu of jail. Seigle agreed that at that time the rules of probation were explained to him. AUSA Davidson read paragraph seven to Seigle, and he confirmed that he had signed the rule of probation and understood them. In 2005, Seigle's probation was revoked. Seigle agreed that he was then interviewed to see whether he qualified for "the special privilege of enhanced probation." Seigle stated that he understood the rules for enhanced probation and also signed a copy of those rules. The witness was shown Exhibit 3 and identified his own signature at the bottom of the rules form. Seigle confirmed that he had agreed to this provision which specifically provided that he was subject to warrantless search. Seigle testified that it was his understanding that if he had not been accepted to enhanced probation, he would have had to stay in jail.

When Seigle was asked whether he understood that when the officers came to his house for this search, he had already given his consent, Seigle responded that he knew he had already "consented to sign this paper." Seigle testified that he knew Monroe because she was his probation officer, but he did not know who the other people at the scene were. Seigle testified that Kszos was wearing a DEA shirt, so he assumed Kszos was a police officer. Seigle said that he had no clue any of the officers were coming when they arrived for the search. Seigle stated that he does not recall telling the police to "go ahead" and search.

*c) further examination*

On re-direct examination, Seigle testified that at the scene he asked the officers to call an attorney and they dialed the number for him. On re-cross examination, Seigle confirmed that this occurred after the officers found the firearm and that he did not ask to speak to an attorney before then.

### B. POSITIONS OF THE PARTIES

#### 1. Defendant

The defendant argues first that Seigle did not give consent to search at the scene. Seigle argues that the fact that he was not free to move about his apartment, even to dress, demonstrates the involuntary nature of the situation. Further, Seigle argues that he was not asked for consent to search nor was he presented with a consent to search form. Seigle argues that his mere acquiescence to the show of authority cannot be interpreted as consent to search. At the conclusion of the evidence, Attorney Burroughs argued that even the government's witnesses did not say Seigle consented to a search of his house.

The defense next argues that the probation condition alone does not give law enforcement blanket permission to search. Citing United States v. Knights, 534 U.S. 112 (2001), the defense argues that absent facts that establish reasonable suspicion that criminal activity is taking place, the probation condition alone does not give authority for a warrantless search. Seigle further asserts that here there were not enough facts from which the officers could draw the requisite reasonable suspicion. The police did not offer any photographs or videotape of their surveillance, they made no effort to conduct an undercover drug buy, did not observe Seigle doing anything illegal, and did not even make a traffic stop of the cars the had observed in order to confirm or dispel their

suspicions.  The paucity of information was actually irrelevant because the probation officers did not even ask the police for details or the nature of their information.

The defense agreed that the Supreme Court has not squarely decided whether reasonable suspicion is necessary in a probation condition search such as this, given the holdings of United States v. Knights, 534 U.S. 112 (2001) and Samson v. California, 547 U.S. 843 (2006).  The defense argues that exceptions to the Fourth Amendment warrant requirement must be construed narrowly and, in the absence of clear directive, the Court should require a showing of at least reasonable suspicion.

## 2.   Government

The government argues that because  Seigle was on Enhanced Probation from State court he had expressly consented to any searches at any time as a condition, as evidenced by his signature on the set of rules in Exhibit 3.  In addition, the government argues that Seigle gave another consent specific to this search when two probation officers came to his house along with KPD Jeremy Maupin and DEA Poston.  The signed Enhanced Probation form is attached as an exhibit to the government's response.

The government also relies on United States v. Knights, 534 U.S. 112 (2001), in addition to a series of cited cases, in which the Supreme Court held that "[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" Knights, 534 U.S. at 114 (quoting Griffin v. Wisconsin, 483 U.S. 868, 874 (1987).  In Knights, the court stated the issue before it as: "In this case, we decide whether a search pursuant to this probation condition, and supported by reasonable suspicion, satisfied the Fourth Amendment."  The court used a Robinette totality of the circumstances analysis in which the probation condition was

"a salient circumstance," rather than the Schneckloth consent analysis urged by the government. The court expressly declined to address whether the search would have been acceptable without reasonable suspicion. Knights, 534 U.S. at 114 (see footnote 6).

Given that Seigle was subject to conditions imposed by his state court conviction, the government draws the Court's attention to State of Tennessee v. Davis, 191 S.W. 3d 118 (Tenn. Crim. App. 2006). Addressing an issue of first impression, the Tennessee Court of Criminal Appeals was presented with a rule almost exactly like Seigle's rule, and which that court found to be exactly like the probation rule in Knights, holding that defendant voluntarily waived certain rights to be put on probation, just as in any plea bargain. But the Tennessee court also found reasonable suspicion to believe that violations of the law were ongoing at the probationer's residence, and thus concluded the search was reasonable. Davis, 191 S.W. 3d at 121. The United States also relies upon Bordenkircher v. Hayes, 434 U.S. 357, 360-64 (1978): noting the value of "give-and-take" of plea bargaining where the accused is free to reject the prosecutor's offer and in which the practice of confronting the accused with more severe alternative is part of that process.

After the evidentiary hearing, the United States supplemented its filings with Post Hearing Response to Defendant's Motion to Suppress Evidence [Doc. 23]. The government argues that Seigle gave actual consent at the scene of the search when the probation officer and others arrived. The government describes the exchange as the officers request to search the apartment pursuant to Seigle's probation conditions, then his consent to their "request."

Alternatively, the government argues that Seigle's consent at the time of the search was not necessary because he had previously acknowledged the officer's authority to conduct to a warrantless search by signing the probation conditions. The government argues further that Seigle

was placed on the enhanced probation program as a direct alternative to jail, situating him more closely to a parolee than an ordinary probationer on the continuum of state-imposed punishments, as discussed by the Supreme Court in <u>Samson v. California</u>, 547 U.S. 843 (2006). Because Seigle's situation was more akin to parole, the government urges the Court to find the probation rule adequate support alone for the search. The government argues that Seigle's status met all the same descriptions as traditional parole, as discussed in <u>Samson</u>.

The government argues also that if reasonable suspicion is required for this probation search, the prosecution has met that standard. The United states argues the facts adduced at the evidentiary hearing demonstrated a strong basis for reasonable suspicion.

### C. ANALYSIS

The Fourth Amendment bars unreasonable searches and seizures by the government. U.S. Const. Amend. IV. "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987). "However, the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment." <u>United States v. Herndon</u>, 501 F.3d 683, 687 (6th Cir. 2007). The Supreme Court has observed, in the context of incarceration, that "[a] broad range of choices that might infringe constitutional rights in free society fall within the expected conditions ... of those who have suffered a lawful conviction." <u>McKune v. Lile</u>, 536 U.S. 24, 36 (2002); <u>accord</u>, <u>Wilson v. Collins</u>, — F.3d —, WL 465363 (6th. Cir. February 22, 2008) (DNA samples from convicted felons); and <u>United States v. Conley</u>, 453 F.3d 674, 678 (6th Cir. 2006)(same); <u>c.f</u>, <u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995) ("The privilege against self-

incrimination does not terminate at the jailhouse door, but the fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis.") . "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" New Jersey v. T.L.O. , 469 U.S. 325, 337 (1985) (quoting Camara v. Municipal Court, supra, 387 U.S. 523, 536-537 (1967). "On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order." Id.

In United States v. Knights, 534 U.S. 112 (2001), the Supreme Court considered whether a warrantless search of an individual on probation after a criminal conviction could be reasonable under the Fourth Amendment. Knights, 534 U.S. at 117-18. In Knights, the search was conducted under the authority of a probation order allowing the search of a probationer's "person, property, place of residence, vehicle, or personal effects" in the absence of a search warrant, arrest warrant, or reasonable cause. Knights, 534 U.S at 114. The Court held that the search of the probationer's home conducted by a law enforcement official aware of the condition was reasonable in light of the Court's "general Fourth Amendment approach of examining the 'totality of the circumstances' with the probation search condition being a salient circumstance." Knights, 534 U.S at 118 (internal citation omitted). The Court ruled that the balance of the factors relevant in the totality of the circumstances analysis, which were the probationer's reduced expectation of privacy and the competing governmental interest in monitoring probationers, led to the conclusion that "reasonable suspicion" of criminal activity was sufficient to conduct a search of a probationer's home. Knights, 534 U.S at 121. Thus, under "[w]hen an officer has reasonable suspicion that a probationer subject

to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. The court also attached significance to the probationer's acceptance of a clear and unambiguous search condition, finding that this fact "significantly diminished Knights' reasonable expectation of privacy." Knights, 534 U.S at 119-120.

The Supreme Court has more recently confirmed this totality of the circumstances approach, holding that a determination whether a search is reasonable requires "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Samson v. California, 547 U.S. 843 (2006) (quoting United States v. Knights, 534 U.S. 112, 118-19(2001)); see also Conley, 453 F.3d at 679-80. In Samson, the Supreme Court applied the totality of the circumstances test in evaluating and upholding a suspicionless search of a parolee. Comparing parolees with regular probationers, the Court held:

> parolees are on the continuum of state-imposed punishments. On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this Court has pointed out, parole is an established variation on imprisonment of convicted criminals .... *The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence.* In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements. ... On the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.

> Samson v. California, 547 U.S. 843, 850 (2006)(internal quotation marks and citations omitted)[emphasis added].

Considering the Samson holding in a case involving the warrantless search of a probationer's house, the Sixth Circuit observed that:

The Court recently extended its <u>Knights</u> holding as it relates to parolees. In <u>Samson v. California,</u> --- U.S. ----, 126 (2006), the Court considered the constitutionality of a California statute requiring parolees to agree "to be subject to search or seizure by a parole officer or other peace office at any time of the day or night, with or without a search warrant and with or without cause." <u>Id.</u> at 2196 (quoting Cal.Penal Code § 3067(a)). Invoking the "totality of the circumstances" approach utilized in <u>Knights</u>, the Supreme Court ruled the statute valid, <u>id.</u> at 2196, and concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee," <u>id.</u> at 2202. It is not yet clear whether courts will apply <u>Samson</u>'s sanction of warrantless and suspicionless searches to probationers as well as parolees, as the Court in Samson recognized that parolees have a lesser expectation of privacy than probationers, because parole is more akin to imprisonment. <u>Id.</u> at 2198. The Sixth Circuit has not considered the question, and its resolution is not necessary to our decision in this case.

 <u>United States v. Herndon</u>, 501 F.3d 683, 688 fn2 (6th Cir. 2007).

Thus the current state of the law is that: (1)a warrantless search of a probationer who has given consent as part of his probation satisfies the Fourth Amendment if there is reasonable suspicion of criminal activity; (2) a warrantless search without reasonable suspicion is acceptable if the person is on parole; and (3) it is undecided whether a warrantless search without reasonable suspicion of a probationer (rather than parolee) is consistent with the Fourth Amendment.  This Court is not required to decide the third issue because it finds there was reasonable suspicion to believe Seigle was engaged in criminal activity.  This Court concludes that Seigle had a diminished expectation of privacy because he was on enhanced probation.  The terms and conditions of his probation unambiguously included his signed concession that the probation officer, or law enforcement, could conduct a warrantless search at their discretion.  While unfettered discretion to search would ordinarily offend the Fourth Amendment, Seigle has been granted release from jail after his initial probation had been revoked and after his acceptance to the special program of enhanced probation, in exchange for his acquiescence to more government intrusion into his life.

This government presence included a 6:00 p.m. curfew, weekly meetings with a supervision officer, random house checks, and warrantless searches.[1]   The rule at issue reads:

> I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by and Probation/Parole officer or law enforcement officer, at any time.
>
> Exhibit 1; Exhibit 3.

The Court finds the probation search condition is "a salient circumstance" for consideration in the totality of the circumstances underlying this search.  Knights, 534 U.S at 118.

Next considering whether the information known to the officers established reasonable suspicion that criminal activity was taking place, the Court considers the result of Herndon, in which the Sixth Circuit concluded that a probation officer's scan of the defendant's computer and of its external hard drive was sufficiently supported by reasonable suspicion that defendant had violated a condition of the probation imposed upon his conviction under Tennessee law for sexual exploitation of a minor.  The condition prohibited the defendant from having Internet access on his

---

[1]  Recognizing the impact of probation or parole on an individual, the Supreme Court recently cited scholarly authority on this topic in a footnote:

> See also Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency .... As the Wickersham Commission said, probation is not merely 'letting an offender off easily' "); 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999) ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist").
>
> Gall v. United States,  – U.S. –, fn4, 128 S.Ct. 586, 595 -596 (December 10, 2007)

computer unless permission for Internet capability had been approved in writing by his probation officer; at meeting with the probation officer, defendant told officer that he had been on the Internet seeking employment. Herndon, 501 F.3d at 683. The Herndon court found reasonable suspicion that the probationer had violated a condition of his probation on facts less compelling than those presented in Seigle's case.

Before considering the information Seigle's probation officer had in this regard, the Court observes that the Sixth Circuit has quoted with approval the Tenth Circuit's description that: "To determine whether reasonable suspicion for suspecting a parole violation exists, we consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances." Herndon, 501 F.3d at 689, quoting United States v. Freeman, 479 F.3d 743, 748-749 (10th Cir. 2007). Also quoted with approval in the Herndon opinion is the Third Circuit holding in United States v. Williams, 417 F.3d 373, 377 (3d Cir.2005) ruling that a police officer "reasonably suspected that [defendant] was violating his parole ... when [third party] told her that Williams was suspected of having a gun." Id. "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Illinois v. Gates, 462 U.S., at 232). The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. United States v. Cortez, 449 U.S. 411, 418 (1981). The Supreme Court has directed reviewing courts making reasonable suspicion determinations to consider "the totality of the circumstances of each case to see whether [an] officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "[T]he likelihood of [wrongdoing] need not rise to the level

required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.

With this framework in mind, the Court turns to the record established at the evidentiary hearing for consideration of facts known to the authorities at the time of the search. The Court finds four distinctive sets of facts were known:

1. Another person, McClure, had named Seigle as a source of cocaine in a debriefing with law enforcement after McClure's arrest for cocaine distribution. Later, Seigle had been found at McClure's apartment upon McClure's arrest for violation of his supervised release due to ongoing cocaine activity. While there is no evidence that anything illegal was happening at the time of McClure's second arrest, Seigle's presence confirmed their acquaintance and association at a time when police strongly suspected McClure had returned to drug activity.

2. Not only was Seigle present, he attempted to leave when he realized the officers wanted to speak with him. Whether Seigle attempted to run away or merely sought a hasty exit is not determinative; the fact that he attempted to leave was known to Monroe, Kszos, Maupin and Poston. The Supreme Court has repeatedly recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam). United States v. Sokolow, *supra*, at 8-9.; As the Supreme Court has recently observed, "[h]eadlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124-125 (2000) (finding reasonable suspicion where suspect fled officers' arrival in a high-crime drug distribution area). Seigle's effort to leave the scene of the arrest of an alleged cocaine distributor was a fact known to authorities.

3.  Authorities were also aware that surveillance of Seigle's townhouse had shown an unusually high volume of people coming and going, staying short periods of time inside.  While the record established that McClure and Seigle are cousins and live very near one another and the human traffic included persons going to and from their two apartments, the fact remained that traffic suggestive of drug sales was observed.  Poston's professional opinion was that this was evidence of drug sales, and no evidence to the contrary was offered on behalf of the defendant to explain the volume of "human traffic" issue.

4.  The testimony was that McClure at one point was said to have named Seigle as a source of his cocaine supply, and later that he had inferred this fact, and that McClure was driving a vehicle registered to Seigle when arrested.

As recently observed by the Sixth Circuit in Dorsey v. Barber, — F.3d — , WL 449969 *5 (6th Cir. February 21, 2008),  "reasonable suspicion is an abstract concept."  Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." Smoak v. Hall, 460 F.3d 769, 778-79 (6th Cir. 2006) (quotation marks and citations omitted).  In examining the totality of the circumstances, "it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers."  Smoak, 460 F.3d at 779 (citing United States v. Hensley, 469 U.S. 221, 231-32).

The Court finds that the four sets of facts, taken together as components of the totality of the circumstances, established "a particularized and objective basis for suspecting legal wrongdoing," thus reasonable suspicion, that Seigle was involved in criminal activity at the time the officers

decided to search his apartment. The Court finds that the supervising officer and the law enforcement officers were justified in suspecting Seigle of criminal activity and in exercising their authority to look into the situation further. This reasonable suspicion, paired with the "salient circumstance" of the probation search condition, provided sufficient basis for a warrantless search of Seigle's home under the authority of United States v. Knights, 534 U.S. 112, 118-19 (2001). The search was not unreasonable and therefor this Court finds no basis for suppression of the evidence found pursuant to the search.

### D: CONCLUSION

For the foregoing reasons, the Court respectfully RECOMMENDS to the District Court that Reginald Seigle's Motion to Suppress Evidence **[Doc. 13]** be **DENIED**.[2]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).